## Audry Campbell v. The State.

### No. 3743.    Decided December 4, 1907.

**Swindling—Insufficiency of the Evidence.**

Where upon trial for swindling, the State's evidence was that the party injured sold the mule to the defendant, for which he was to be paid later in the day, and that the defendant did not pay him; and defendant's defense was that he traded the injured party a horse for his mule, the transaction did not constitute swindling under either theory.

Appeal from the County Court of Smith. Tried below before the Hon. J. A. Bulloch.

Appeal from a conviction of swindling, a misdemeanor; penalty, a fine of $25 and twenty days confinement in the county jail.

The opinion states the case.

*B. B. Beaird* and *W. F. Boyett,* for appellant.—On question of the insufficiency of the evidence to sustain a conviction for swindling: Johnson v. State, 41 Texas, 65; Mathews v. State, 10 Texas Crim. App., 279.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—This is a conviction for swindling. The State's contention is that the party alleged to be swindled was the owner of a little brown mare mule, and that on the 16th of February, 1906, he brought the mule to the City of Tyler and sold it to appellant for $22.50, a cash transaction. The alleged owner of the mule, Freeman, among other things during the conversation that led up to the trade with the accused, said he asked the accused $25 for the mule; that the

accused then told him he had a horse out at his house (and this is shown to be a mile and a half east of Tyler) that a man in town, Will Harts-field, had bought for $22.50 and that he would give him that amount for the mule.  The witness told appellant that he would take that for the mule.  They got in the wagon, drove out to appellant's house, lead-ing the little mule behind the wagon to that point, and upon arriving there the witness untied the little mule from the wagon and appellant took the mule and turned it in his lot, placing the rope taken from the mule on the horse, brought him out and tied him behind the wagon, requesting the witness to drive on back to town, stating that he would go to town another way as he had a little business that required his attention, and that he would be in town in a little while and pay the witness for the mule.  The witness returned to town, leading the horse behind the wagon.  He further states that appellant told him the horse . was to be delivered to Hartsfield and did not say anything about trading the horse for the mule.  On arriving at the rack in the City of Tyler from which they had started, horsetraders there began to tell him how trifling the horse was and how badly he (witness) had been cheated by appellant in the trade.  He (witness) informed them that he did not trade the mule for the horse.  After remaining around there for some-time, appellant not appearing, he took one of his mules from his wagon and rode back to Campbell's residence to see him and get his money. When he reached Campbell's residence he was gone; he returned to town without Campbell or his mule, and after doing so he met Hartsfield and obtained from him the information that Hartsfield had not bought a horse from appellant.  After remaining around the rack a while appel-lant rode up, got down and hitched his horse, the horse that witness brought in from Campbell's house being hitched there about the rack. The witness demanded pay of appellant for his mule, which was re-fused.  Appellant denied having bought the mule and asserted that he traded the horse to him for the mule.  The evening passed and the mule was not paid for and the witness left the mule in Campbell's possession, thinking he was going to pay cash for it.  The witness turned the horse over to Henry Keel to take care of or to do with him as he saw proper, and gave him a writing to show that he did not sell Keely the horse nor give him a bill of sale of the horse.  This is practically the State's case.  There are other facts and circumstances, but as we view the tes-timony of this witness, it adds nothing of any moment to what has been stated.

Bynum testified that he was present when Freeman and defendant traded.  In regard to the transaction here under discussion, and on the day the trade was made, Freeman was in his wagon on the public square near the horses' rack in Tyler and had with him a little brown mare mule tied behind his wagon that the witness had previously traded to Freeman.  He asked Freeman if he would trade the mule, and Freeman replied that he was waiting for Audry Campbell; that he and Campbell were on a trade; that they were going out to Campbell's house to look at

a horse of Campbell's; that he saw them drive out towards Campbell's house leading the little mule behind the wagon; that within about an hour Freeman returned to the public square with Campbell's horse tied behind his wagon but without the little mule. This witness had owned this horse previously; he figured the value of the mule from $12.50 to $17.50 and had seen this particular mule sold for $10.

Jim Jackson testified that he saw Freeman the day he drove up on the east side of the public square in Tyler and where horsetraders gathered themselves together for trading purposes. Freeman came up in his wagon driving two mules with a little, old, poor, brown-colored mare mule tied behind the wagon; driving up where these people were congregated, Freeman stopped. Witness stepped out and asked him if he would trade his mule; he said yes, but he had rather sell it, and would take $22.50 for it. Witness declined to give that and told him he had nothing to trade, but some of the boys might give him a trade. Appellant walked up at that time and witness remarked to Freeman that Campbell would like to trade with him, and Freeman asked appellant what he had to trade, and was informed that he had a horse out at his house that he would trade. This witness left them talking about trading, and in a few minutes afterwards he saw Campbell and Freeman in Freeman's wagon going east toward Campbell's residence with the little mule still tied behind Freeman's wagon and being led. In about two hours Freeman came to him at the rack where they had first met and wanted him to sell the horse for him. It was the same horse appellant had owned. This witness then placed his halter on the horse and tied him to the rack; went away, was gone a few minutes, and returned, and when he returned Freeman was then delivering the horse to a young man whose name was Keel, and Freeman informed this witness that he had sold the horse to Keel for $15 and Freeman asked this witness to write a bill of sale of the horse to the man and Freeman delivered the horse and bill of sale he wrote to Henry Keel, and that Wade Sanders at the instance of Freeman signed the bill of sale as a witness.

Wade Sanders testified that he saw Freeman and appellant talking about something that day; did not hear the conversation; saw them go away towards defendant's house leading the mule. Afterwards he saw Freeman return to the square with Campbell's horse tied behind the wagon. Freeman requested this witness to sell the horse for $15, and directly afterwards this witness saw Freeman sell and deliver the horse to Henry Keel for $15. That Freeman had Jackson, a witness, to write a bill of sale of the horse from him to Keel, and asked this witness to sign the bill of sale as a witness, which he did, and Freeman delivered the horse and bill of sale to Keel then. He further stated he did not see any money paid by Keel but understood the sale was on a credit and dd not remember the wording of the bill of sale.

The witness Estes testified that he lives in Tyler, and did live there at the time of the transaction between Freeman and appellant and was in

the market business, and bought the horse Freeman got from defendant from Henry Keel that same evening he had got him from Freeman.

Edwards testified that he subsequently bought the little mule; does not recollect exactly how long it was after Campbell got it from Freeman, but it was very poor and small and worth very little; that he fed it and got it in very good condition, and traded it to a negro and Mr. Mims.

The defendant testified in his own behalf along about the middle of the day Freeman drove into town and to a point where he and others were, with the little mule tied behind his wagon and stopped his wagon. The boys began talking to him about trading and that he (appellant) went up and asked him if he wanted to trade the mule, and he said yes; that he wanted to sell it as he did not need it. Appellant then told Freeman that he had a horse at his house a mile and a half from town that he would trade for the mule. They got in the wagon and drove to appellant's house, leading the little mule. When they reached the place Freeman got out and looked at the horse that was in the lot and examined him and told appellant he would give him the mule for the horse, and they traded. The mule was untied from the wagon and put in the lot; the rope taken from the mule and put on the horse by Freeman, who led the horse out and tied him behind his wagon, and drove back to town with the horse. After Freeman left, appellant ate his dinner, saddled his horse and rode to town, going to the same racks where the parties had previously met, and got down, and hitched his horse. He saw Freeman there and his wagon, and the horse that he (appellant) had traded him for the mule was hitched to the rack, a good many persons and traders being immediately around the rack. After he had been there a little while Freeman stepped up to him and said to him, "I want you to pay me for my mule." The accused then told him that he had his pay for the mule, and Freeman asked, "What have I got?" and appellant pointed to the horse, "You see what you have got." That Freeman then denied giving him the mule for the horse and wanted appellant to pay him $22.50 for the mule. Appellant states that he told Freeman before they traded that he had been offered $22.50 for the horse but did not tell him who offered it, nor that he stated that he had sold the horse for that amount, nor that he would sell or deliver the horse to the party and get money and pay him for the mule. He further testifies, a little later in the evening he saw that Freeman had sold the horse to Keel and given him a bill of sale. This is practically and substantially the case except some testimony introduced by the State as to the standing of Freeman as a truthful man.

As we understand the record, there are two propositions, or two deductions to be arrived at from the facts: First, that Freeman was to let appellant have the mule for which appellant was to pay him that day $22.50 and that appellant did not do so, but got Freeman to go to his house, leave the mule and bring his (appellant's) horse to town, and instead that it was a trade of the mule for the horse. Appellant's theory of the case is that there was a trade in which he gave the horse for the mule.

Freeman corroborates appellant's theory substantially in that he drove out to appellant's house, curried the mule, left it and got the horse that he brought to town in exchange for the mule. He is further corroborated by the fact that Freeman turned the horse over to another party for the purpose of being sold, and was sold to Keel and bill of sale given. Appellant's version of it is proved by several witnesses who are named in the above statement to the effect that they heard the transaction and the trade, or rather they saw the parties get in the wagon and drive out to appellant's house to look at the horse, and that Freeman left the mule and returned to town with the horse. The State's theory must be supported by the testimony of Freeman to the effect that he sold the mule and was to be paid the money that day. Freeman's testimony excludes the idea that it was to be paid at the time it was turned over, but shows that it was to be paid after they returned to town. We are of opinion that this does not constitute the offense of swindling. It was a sale under Freeman's view of it of the mule to appellant to be paid for during the day after their return to town. The money was not paid. Of course, if the testimony of appellant's witnesses who testified to hearing the trade made between appellant and Freeman is true, there could not possibly be any swindling. So under either view of it, as we understand the testimony, it was not swindling. Therefore believing the testimony not sufficient to support the conviction, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Henderson, Judge, absent.